UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    Plaintiff,

            - v. -

ANTHONY ROSE,
        a/k/a "Todd Chambers,"
JELANI WRAY,
        a/k/a "Lani,"
        a/k/a "J.R.,"
NATHANIEL COLES,
        a/k/a "Nat,"
TARA ROSE,
        a/k/a "Christine Waters,"
        a/k/a "Christine Hinds,"
        a/k/a "Taylor Hinds,"
ANTHONY ROSE, Jr.,
        a/k/a "Sean Wells,"
CHRISTINA GARCIA,
        a/k/a "Cindy,"
LUIS VILELLA,
        a/k/a "Angel Martinez,"
LEON BLUE,
        a/k/a "Boochie,"
CLARENCE FACEY,
        a/k/a "Face"
ANA RIVERA,
        a/k/a "Melissa Ramos,"
DEJAHNEA BROWN,
        a/k/a "Michelle Williams,"
TONYA THOMAS,
        a/k/a "Karen Schwartz,"
ANGELA MELECIO,
        a/k/a "Angie,"
        a/k/a "P2,"
STEPHANIE PASCAL,
        a/k/a "Steph,"
        a/k/a "P5,"
MAKEBA SIMMONS,
EDWARD ABAYEV,
        a/k/a "Eddie,"
GRACIELA BORRERO,

**MEMORANDUM
OPINION & ORDER**

19 Cr. 789 (PGG)

a/k/a "Grace,"
        a/k/a "P8,"
BARRINGTON REID,
        a/k/a "P9,"
TONJA LEWIS,
        a/k/a "J1,"
RAYMOND PARKER,
        a/k/a "Andre,"
        a/k/a "J2,"
BERLISA BRYAN,
        a/k/a "Lisa,"
ANGELA MYERS,
        a/k/a "Angie,"
LATIFAH ABDUL-KHALIQ,
SHAKEEMA FOSTER,
KOURTNEI WILLIAMS,
MAKKAH SHABAZZ,
        a/k/a "Mecca," and
YANIRIS DELEON
        a/k/a "Jen,"

                        Defendants.

PAUL G. GARDEPHE, U.S.D.J.:

Defendants are charged with conspiracy to violate the Travel Act, wrongful

disclosure of individually identifiable healthcare information, payment of bribes and gratuities to

an agent of a federally funded organization, and solicitation of bribes and gratuities by an agent

of a federally funded organization. The Government claims that the Defendants participated in a

"no-fault" conspiracy involving the use of stolen motor vehicle accident victim information from

the New York City Police Department (the "NYPD"), hospitals, and other entities as the basis

for referrals to medical clinics and lawyers, with the ultimate goal of receiving kickbacks from

those medical clinics and lawyers.

Defendant Leon Blue has moved (1) to suppress evidence obtained through wiretap interceptions; (2) for a severance; and (3) for a bill of particulars. For the reasons stated below, Defendant Blue's motions will be denied.

## BACKGROUND

### I.    THE GOVERNMENT'S FACTUAL ALLEGATIONS

The Government alleges that the Defendants operated a fraudulent "no-fault" insurance referral ring, in which the Defendants referred victims of motor vehicle accidents – whose information they had stolen from the NYPD, hospitals, and other entities – to certain lawyers and medical clinics in exchange for kickbacks. (Indictment (Dkt. No.1) ¶¶ 1-3) The scheme is premised on "no-fault" automobile liability insurance available in New York and New Jersey, which requires automatic payment of insurance claims for certain types of motor vehicle accidents as long as the claim is legitimate and below a specified damages threshold. These automatic benefits are up to $50,000 in New York and at least $15,000 in New Jersey. (Id. ¶¶ 5-7 (citing N.Y. INS. LAW §§ 5101, et seq.; 11 N.Y. COMP. CODES R. & REGS tit. 11, §§ 65, et seq.; N.J. STAT. ANN. §§ 39:6A, et seq.; N.J. ADMIN. CODE §§ 11:3-7, et seq.))

According to the Government, Defendant Anthony Rose – the alleged organizer of the fraudulent scheme – led four groups of co-conspirators: (i) Payor Conspirators, who served as brokers cultivating lead sources and paying them bribes for information; (ii) Call Center Conspirators, who contacted motor vehicle accident victims and steered them to lawyers and medical providers participating in the scheme; (iii) Hospital Lead Sources – employees of and contractors for federally-funded hospitals – who sold confidential patient information regarding accident victims to Rose and his co-conspirators in exchange for bribes; and (iv)

NYPD Lead Sources – NYPD employees who provided confidential information regarding accident victims to Rose and his co-conspirators in exchange for bribes.  (Id. ¶ 4)

The Indictment alleges that Rose and his co-conspirators bribed as many as fifty individuals working for the NYPD, federally-funded hospitals, and other entities, paying these sources as much as $4,000 per month in cash.  Once Rose and his co-conspirators obtained the accident victim information from sources, Rose provided the information to Call Center Conspirators, who would contact the victims.  The Call Center Conspirators used a script to encourage or steer the victims to obtain medical treatment at certain clinics and to obtain legal services from certain law firms.  The scripts used by the Call Center Conspirators included false names and fictitious companies, lies about how the accident victims' information had been acquired – including that the call center was affiliated with the New York State Department of Transportation – and a direction not to speak with anyone else about the insurance claim.  The co-conspirators used aliases and code names, so-called "burner" phones that were used briefly and then discarded, fictitious companies, and encrypted mobile applications.  Spreadsheets were used to track the fraudulent scheme.  The Call Center Conspirators were instructed to target accident victims from low-income neighborhoods.  In Rose's view, such victims could be more easily brought into the scheme.  (Id. ¶¶ 8-14)

According to the Indictment, between 2014 and 2019, the Defendants referred approximately 6,000 motor vehicle accident victims to participating medical clinics and lawyers.  Rose and his co-conspirators were paid, on average, $3,000 per successful referral.  (Id. ¶¶ 11-12)  The confidential information of as many as 60,000 motor vehicle accident victims was compromised as a result of the alleged scheme.  (Id. ¶ 13)

## II.     THE CHARGES IN THE INDICTMENT

The Indictment contains thirty-two counts.  Count One charges all twenty-seven defendants with conspiracy to violate the Travel Act.  (Id. ¶¶ 15-17)  Counts Two through Thirteen charge twelve defendants, including the Hospital Lead Source Defendants, Anthony Rose, Nathaniel Coles, and Leon Blue, with wrongful disclosure of individually identifiable health care information.  (Id. ¶¶ 18-41)  Counts Fourteen through Seventeen charge Defendants Anthony Rose, Nathaniel Coles, Anthony Rose Jr., and Leon Blue with paying bribes and gratuities to an agent of a federally funded organization.  (Id. ¶¶ 42-49)  Counts Eighteen through Thirty-Two charge fifteen defendants, including the Hospital Lead Source Defendants and the NYPD Source Defendants, with solicitation of bribes and gratuities by an agent of a federally funded organization.  (Id. ¶¶ 50-79)

## DISCUSSION

## I.     MOTION TO SUPPRESS WIRETAP EVIDENCE

### A.     Court-Authorized Wiretaps

The investigation of the Defendants' fraudulent scheme was initially pursued by the Westchester County District Attorney's Office (the "D.A.") and the New York State Police. The investigation began in 2013 with a focus on staged accidents.  The target of the initial wiretap application in June 2016 was Robert Garris, who allegedly was recruiting "victims" and steering them to a particular medical clinic located at 2 Wilson Place in Mount Vernon, New York.  The clinic – which was operated by Defendant Nathaniel Coles – paid kickbacks for the referrals.  (June 21, 2016 Utzig Aff., ¶¶ 2, 33-268)

Prior to seeking the wiretap on Garris, the D.A. and State Police had used a number of traditional investigative techniques, including undercover officers, confidential

informants, and analysis of telephone records. These techniques had not proven adequate to identify all of the individuals involved in the scheme and collect the evidence necessary to prosecute them. (June 21, 2016 Cecchini Aff., ¶¶ 11-12)

The initial wiretap was authorized by Justice Warhit of the New York Supreme Court. (July 21, 2016 Cecchini Aff. ¶ 4) In July 2016, Justice Warhit authorized an extension of the Garris wiretap and a new wiretap on Coles' phone based on affidavits demonstrating both that Garris and Coles were using the subject telephones to engage in insurance fraud and that traditional investigative techniques – while still being utilized by investigators – remained inadequate to discover the full scope of the criminal activity and to identify all of those participating in it. (July 21, 2016 Utzig Aff., ¶¶ 22-25, 40, 46, 53-54, 66, 74, 94, 97-98, 111-128; July 21, 2016 Huseby Aff., ¶¶ 10-40; Aug. 17, 2016 Utzig Aff., ¶ 6)

Interception of Defendant Cole's communications revealed that he was a small part of a much larger network. In August 2016, Justice Warhit authorized the continued interception of communications over the Garris and Cole phones. He did so based on an affidavit indicating, inter alia, that Coles' text messages indicated that he was bribing first responders and medical personnel to disclose information about car accident victims. (Aug. 17, 2016 Utzig Aff., ¶¶ 56-57) Coles forwarded the information that he obtained a telephone registered to the "Law Office of Lee A. Fine." (Id. at ¶ 58) The D.A. was not able to identify the user of this phone. Wiretap evidence obtained later revealed that lead Defendant Anthony Rose used that phone. (Sept. 16, 2016 Schneeloch Aff., ¶¶ 83-109; Oct. 14, 2016 Schneeloch Aff., ¶ 8)

The affidavit submitted in support of the August 18, 2016 wiretap application recounts the investigators' continued use of traditional investigative techniques, and the

inadequacy of these traditional techniques to reveal the all of the participants in the criminal activity, including the "victims" and the corrupt medical staff and attorneys. (Aug. 18, 2016 Huseby Aff., ¶¶ 11-47)

On September 16, 2016, the D.A. obtained a wiretap on what investigators later learned was lead Defendant Anthony Rose's phone (the "Rose phone"). (Oct. 14, 2016 Cecchini Aff., ¶ 7) In the month preceding September 2016, interceptions of communications over Cole's phone indicated that he consistently sent names and telephone numbers of car accident victims to the user of that phone. The user of the Rose phone identified himself as "Todd Chambers," and it was he who arranged for medical clinics and lawyers to pay Coles for patient referrals. Despite extensive investigation, including surveillance, investigators were not able to determine whether the user of the Rose phone was Anthony Rose, his son Anthony Rose, Jr., or someone else. (Sept. 16, 2016 Schneeloch Aff., ¶¶ 83-109)

In the September 16, 2016 wiretap application, the D.A. explains at length the numerous, traditional investigative techniques that had been used, and why those techniques had proven insufficient to disclose all the details of the criminal enterprise, including all of its participants and the flow of the illegal proceeds of the scheme. (Sept. 16, 2016 Cecchini Aff., ¶¶ 11-55)

On October 14, 2016, the D.A. sought an extension of the wiretap on the Rose phone. In the affidavit filed in support of the application, investigators reported on what the prior month's interceptions had revealed, including that dozens of individuals were improperly providing confidential information to the conspirators, and that the conspirators were using a call center staffed with at least fifteen employees to steer accident victims to corrupt clinics and attorneys. The affidavit explains that call center employees used fictitious names and assigned

code names to those providing confidential information, making it difficult to identify the corrupt medical staff and first responders. (Oct. 14, 2016 Schneeloch Aff., ¶¶ 20, 39-63)

The application for the October 14, 2016 extension includes seventeen pages that address the traditional investigative techniques that had been used or considered to date, including video surveillance, physical surveillance, GPS devices, phone record analysis, confidential informants and undercover officers, arrests and search warrants. Investigators separately address each investigative technique and explain why that technique is either impractical or inadequate to identify the scope, organization and makeup of the criminal enterprise. (Oct. 14, 2016 Cecchini Aff., ¶¶ 17-60)

On November 10, 2016, investigators sought an extension of the wiretap on the Rose phone. In the State Police affidavit supporting the extension application, investigators explain that the intercepted conversations reveal that Defendant Anthony Rose was receiving kickbacks from seventy-five medical clinics and twenty-five lawyers, and was seeking to expand his network of corrupt sources, clinics, and lawyers into New Jersey. (Nov. 10, 2016 Schneeloch Aff., ¶¶ 55-56, 58, 66, 81, 98, 106)

The D.A.'s affidavit for the November 10, 2016 extension request contains a similar nineteen-page discussion of the alternative investigative techniques that have been found wanting or are otherwise impractical. The D.A. once again separately considers each investigative technique and the challenges associated with its use, and explains why these traditional techniques will not reveal the full extent of the criminal enterprise. (Nov. 10, 2016 Cecchini Aff., ¶¶ 20-68)

Investigators obtained monthly extensions of the wiretap on the Rose phone through March 2017. Each extension application is accompanied by affidavits that similarly

address recent developments in the investigation and why traditional investigative techniques are not adequate to reveal the full scope of the criminal enterprise and all of its participants. (Dec. 8, 2016 Schneeloch Aff.; Jan. 6, 2017 Schneeloch Aff.; Feb. 3, 2017 Schneeloch Aff.; Mar. 2, 2017 Schneeloch Aff.; Nov. 10, 2016 Cecchini Aff.; Dec. 8, 2016 Cecchini Aff.; Jan. 6, 2017 Cecchini Aff.; Feb. 3, 2017 Cecchini Aff.; Mar. 2, 2017 Cecchini Aff.)

### B.     **Defendant Blue's Suppression Motion**

Blue has moved to suppress recordings of all calls on which he was intercepted, and all evidence derived from these intercepted calls. (See Blue Br. (Dkt. No. 321) at 1, 7)

As to the October 2016 extension of the wiretap on Defendant Anthony Rose's phone, Blue contends that by that time wiretapping was no longer "necessary," because investigators had been intercepting calls for four months, had intercepted calls made over six different cell phones, and had listened to thousands of calls pursuant to five prior wiretap applications. (Id. at 7)

Blue also complains that the investigators "defined the investigation's goals in the broadest possible terms – indeed, making them goals that no investigation could ever reasonably reach" – in order to continue wiretapping beyond the point of necessity. (Id. at 8)

As to the November 10, 2016 and December 8, 2016 wiretap applications, Blue complains that they do not set forth the steps taken – using traditional investigative techniques – to identify "Boochy."[1] According to Blue, the D.A. did not explain why a wiretap was necessary to identify "Boochy" or why traditional investigative techniques were inadequate or impractical to achieve this investigative objective. (Id. at 11)

---

[1] "Boochy" is Blue's nickname. (Id. at 11)

Finally, Blue contends that the evidence obtained from the wiretaps authorized between December 2016 and March 2017 must be suppressed, because investigators should have independently stopped using the wiretap in order to determine whether traditional investigative techniques remained inadequate.  (Id. at 12)

## C.    Legal Standards

### 1.    Standing

A person has standing to suppress communications intercepted by the Government where that person "was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  18 U.S.C. § 2510(11). The parties agree that Blue has standing to move to suppress only calls or messages in which he was a participant.  (Govt. Opp. (Dkt. No. 333) at 22-23; Blue Reply (Dkt. No. 340) at 1)

### 2.    Requirements for Authorizing a Title III Wiretap

Before authorizing the interception of electronic communications pursuant to Title III, a court must find that

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a [crime enumerated in 18 U.S.C. § 2516];
>
> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
>
> (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; [and]
>
> (d) . . . there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense . . . .

18 U.S.C. § 2518(3).

The statutory requirement that "normal" investigative techniques be addressed in wiretap applications is simply "'designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" United States v. Serrano, 450 F. Supp. 2d 227, 236 (S.D.N.Y. 2006) (quoting United States v. Kahn, 415 U.S. 143, 153 n.12 (1974)). The legislative history accompanying Section 2518 indicates that "normal investigative techniques" include,

> for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants.

S. REP. NO. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2190.

Courts must take a "commonsense approach" to the necessity requirement. United States v. Concepcion, 579 F.3d 214, 218 (2d Cir. 2009). Although "generalized and conclusory statements that other investigative procedures would prove unsuccessful" do not suffice, "the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." Id. (internal quotation marks and citation omitted); see also United States v. Trippe, 171 F. Supp. 2d 230, 236 (S.D.N.Y. 2001) ("While generalized or conclusory statements in an application are insufficient to support a showing of necessity, the application must be viewed in a practical and common sense manner and need be only minimally adequate to support the issuing judge's determination of necessity." (internal citation omitted)). "'The statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.'" Id. (quoting United States v. Diaz, 176 F.3d 52, 111 (2d Cir. 1999)). There is no requirement "'that any particular investigative procedures be exhausted before a wiretap may be authorized.'" United States v. Miller, 116 F.3d 641, 663 (2d Cir. 1997) (quoting

United States v. Young, 822 F.2d 1234, 1237 (2d Cir. 1987)). "[A] reasoned explanation, grounded in the facts of the case, and which squares with common sense, is all that is required." United States v. Scala, 388 F. Supp. 2d 396, 404 (S.D.N.Y. 2005) (internal quotation marks and citations omitted).

"The issuing judge's determination that the Government has made adequate use of alternative investigatory techniques is entitled to substantial deference." Trippe, 171 F. Supp. 2d at 236 (citing United States v. Wilkinson, 754 F.2d 1427, 1433 (2d Cir. 1985)).

The Second Circuit has noted that "'wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.'" United States v. Fleishman, No. 11 Cr. 32(JSR), 2011 WL 4000987, at *3 (S.D.N.Y. Aug. 31, 2011) (quoting United States v. Steinberg, 525 F.2d 1126, 1130 (2d Cir. 1975)); see also Steinberg, 525 F.2d at 1131 ("[T]he very scope of the operations described in the affidavit made it highly likely that numerous narcotics-related communications would take place in the future."). Moreover, where – as here – a far-flung conspiracy is at work, the need for a wiretap may be compelling: "the clandestine nature of alleged conspiracies makes them relatively less susceptible to normal investigative techniques." United States v. Feola, 651 F. Supp. 1068, 1105 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir. 1989).

Defendants bear the burden of demonstrating that a wiretap application was deficient. United States v. Fea, No. 10 Cr. 708(PKC), 2011 WL 1346981, at *4 (S.D.N.Y. Apr. 5, 2011) (citing United States v. Magaddino, 496 F.2d 455, 459-60 (2d Cir. 1974) ("[T]he burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed.") (internal quotation marks and citation omitted)).

D.    **Analysis**

1.    **The October 2016 Wiretap Application**

In arguing that the wiretap on the Rose phone was no longer necessary as of

October 2016 – and that the scope, duration, and goals of the investigation set forth in the

application were too broad – Blue misapprehends the relevant standard for wiretap

authorizations.  The "necessity" determination turns on whether law enforcement "'inform[ed]

the authorizing judicial officer of the nature and progress of the investigation and of the

difficulties inherent in the use of normal law enforcement methods.'"  Concepcion, 579 F.3d at

218 (quoting Diaz, 176 F.3d at 111).  This is precisely what the affidavits submitted in support of

the October 2016 application address, and Blue does not contend otherwise.

As discussed above, the affidavits submitted in support of the October 2016

wiretap application explain in great detail (1) the nature and progress of the investigation; and (2)

the reasons why traditional investigative techniques were impractical or unlikely to be

successful.  The 77-page affidavit submitted by State Police Investigator Paul Schneeloch sets

forth the information gleaned from the investigation to date including, for each individual whose

phone(s) the Government sought to wiretap, details regarding that individual's involvement and

role in the conspiracy.  (See Oct. 14, 2016 Schneeloch Aff.)

For example, as to Anthony Rose, Schneeloch's affidavit explains that intercepted

telephone calls have revealed that an individual identifying himself as "Todd Chambers" is in

reality Anthony Rose, and that Rose operated a call center employing fifteen people that was an

integral part of the scheme.  (Id. at ¶¶ 12-16, 18, 20)  The call center employees were "tasked

with calling accident victims in an attempt to sign them up for medical treatment at any of the

network's clinics, to follow and monitor their treatment and to assign them an attorney."  (Id. ¶

20)  And, as explained in an October 14, 2016 affidavit submitted by Westchester County

Assistant District Attorney Craig Cecchini, investigators still lacked, <u>inter</u> <u>alia</u>, "details regarding

the identification, hierarchy and roles of the members of the Rose operation," as well as "the

identification of the sources of Rose's leads" and "the other clinics that Rose and [Jelani Wray,

a/k/a 'Lonnie' or 'J.R.'] have an interest in, as well as the other clinics involved in this network."

(Oct. 14, 2016 Cecchini Aff. ¶ 60)

Cecchini's affidavit also explains why this information and other investigative

details that the Government sought to obtain through the October 2016 wiretap were unlikely to

be gleaned through traditional investigative techniques, including video surveillance, physical

surveillance, GPS devices, confidential informants, undercover officers, arrests, and search

warrants.  (<u>See</u> Oct. 14, 2016 Cecchini Aff. ¶¶ 17-60)  While investigators were continuing to

attempt to make use of certain traditional investigative techniques – such as confidential

informants and undercover officers, physical surveillance, and telephone record analysis –

traditional investigative techniques were proving ineffective or were expected to become

ineffective in the absence of a wiretap.  (<u>See</u> <u>id.</u> ¶¶ 17-22)

In his affidavit, Cecchini explains that video and physical surveillance were

ineffective on their own, because the conspirators were meeting inside buildings and vehicles.

Much of the conspirators' illegal activities was conducted "behind the scenes" and "in private

medical offices, where the public is not allowed."  (<u>Id.</u> ¶¶ 26, 32)  Moreover, "a large portion of

the[] . . . crimes are committed through the use of the telephone, and surveillance, in any

manner, will not allow this investigation to proceed past this initial stage."  (<u>Id.</u> ¶ 31)  Similarly,

while use of GPS devices and analysis of telephone records could provide some information

about when, where and with whom communications and meetings were taking place, these

techniques would not permit investigators to learn "the contents of any communications," absent which the Government would "continue to only have a circumstantial case against some members of the criminal enterprise, while none against the top members of the organization, such as Rose [and] Coles[.]"  (Id. ¶¶ 34-41)

Moreover, the D.A. and State Police did not have any viable confidential informants for use in the investigation.  (Id. ¶¶ 42-45)  Use of undercover officers was unlikely to be successful because, if the undercover was introduced as an accident victim, he or she would not be permitted to "undergo invasive medical procedures" and would thus not be able to gather useful evidence, and in any event the undercover officer likely could not obtain evidence as to Coles or Rose, who were "insulated from the manager level."  (Id. ¶ 53)

Arresting members of the enterprise and seeking their cooperation was not likely to be successful, because investigators did not have sufficient evidence against medical personnel or the lawyers involved in the scheme to convince them to cooperate against other members of the enterprise.  (Id. ¶ 47)  While the investigation had produced some evidence against Coles and Rose, the D.A. and the State Police did not believe that this evidence would be sufficient to "cause either of them to cooperate with [the] investigation into the organization at large."  (Id. ¶ 49)  Arresting an accident victim and seeking his or her cooperation was also not likely to be successful, because victims dealt only with "the front line medical personnel and support staff for the attorney," rather than Rose and Coles, the leaders of the conspiracy.  (Id. ¶¶ 50-52)

While investigators could have sought a search warrant for the 2 Wilson Place medical clinic, they believed that the medical files at this location would not reveal "the financial gain and location of the proceeds of these fraudulent accidents or exaggerated injuries."  The

medical files would also "not reveal the fraudulent reasons behind conducting these tests and treatment." (Id. ¶¶ 56-57)

ADA Cecchini informed Justice Warhit that investigators planned to seek a search warrant for an email account established by Rose and provided to a lawyer. Cecchini stated that the email account was not likely to reveal a complete list of clients that Rose had referred to that lawyer, however. (Id. ¶ 57)

Finally, Cecchini informed the court that investigators did not have sufficient evidence to charge Rose or Coles. Charging a low-level player in the conspiracy would "trigger the premature discovery of the underlying investigation[.]" (Id. ¶ 54)

Blue contends that the October 2016 wiretap application makes only a "rote" or conclusory showing of necessity. (See Blue Br. (Dkt. No. 321) at 10) As discussed above, however, the investigators explained in detail why traditional investigative techniques had been unsuccessful or were unlikely to be successful. Moreover, while Blue argues that the stated goals of the investigation in the October 2016 wiretap application are overly broad – because investigators sought to identify and to gather sufficient proof to successfully prosecute all members of the conspiracy, to determine how fraud proceeds were distributed and where those fraud proceeds were maintained, and to discover additional overt acts taken in furtherance of the conspiracy – he cites no law suggesting that the investigative goals listed in the wiretap application are improper.

Indeed, courts in this Circuit routinely cite similar investigative goals in finding that the necessity requirement is met. See, e.g., United States v. Bailey, No. 15-CR-6082G, 2016 WL 6082239, at *11 (W.D.N.Y. Oct. 17, 2016) (finding that necessity requirement was met where wiretap application stated that traditional investigative techniques "would not identify

15

roles of unknown coconspirators or produce evidence sufficient to reveal the full picture of the

vertical structure of the network"); United States v. Barrera, 950 F. Supp. 2d 461, 470-71

(E.D.N.Y. 2013) ("Many courts in the Second Circuit have held that wiretaps are permissible

where normal investigative techniques are able to uncover evidence of discrete crimes by

members of a criminal enterprise but not able to uncover evidence of the scope of the enterprise

as a whole.") (collecting cases); United States v. House, No. 12CR74S, 2013 WL 12191963, at

*5-6 (W.D.N.Y. Jan. 29, 2013) (finding that necessity requirement was met where stated goals in

wiretap application included "(i) the nature, extent and methods of operation of the corrupt

activities of the SUBJECT INTERCEPTEES and others; (ii) the identities and roles of

accomplices, aiders and abettors, co-conspirators and participants in their illegal activities; (iii)

the source, receipt, and distribution of law enforcement information; (iv) the source, receipt, and

distribution of bribe money paid for law enforcement information; (v) the locations and

dispositions of proceeds from bribery and corrupt activities"); Serrano, 450 F. Supp. 2d at 233,

241 (finding that necessity requirement was met where wiretap application stated that traditional

investigative techniques could not "identify all the members of this criminal conspiracy,

sufficiently define the roles of the conspirators for the purposes of successful prosecution,

effectively identify all the sources or routes used for the supply of cocaine, describe all the

methods of the alleged protection which is being provided to this group, or identify all the

methods of concealing or disguising the nature, location, source, control and disposition of the

proceeds of the sale of illegal narcotics"); United States v. Harris, No. 00 CR 105(RPP), 2000

WL 1206724, at *3 n.6 (S.D.N.Y. Aug. 24, 2000) ("Defendant also claims that the government's

statement that the confidential informants' inability "to 'fully' identify 'all' members of the

alleged organization 'sufficiently' for prosecution[] is not a sufficient basis to justify the use of

wiretap surveillance. . . . To the contrary, the government may rely on wiretap surveillance when other investigative methods have failed to reveal the identities of additional co-conspirators.")

In sum, the October 2016 wiretap application sufficiently explains why traditional investigative techniques are inadequate to achieve the goals of the investigation, and there is nothing improper in the stated goals of the investigation.

### 2. The November 10, 2016 and December 8, 2016 Wiretap Applications

Blue contends that evidence obtained as a result of the November 10, 2016 and December 8, 2016 wiretap applications must be suppressed, because investigators did not set forth the steps they had taken to use traditional investigative techniques to identify "Boochy," or explain why traditional investigative techniques would not be adequate to achieve this investigative goal.  (Blue Br. (Dkt. No. 321) at 11)

In United States v. Kazarian, No. 10 Cr. 895(PGG), 2012 WL 1810214 (S.D.N.Y. May 18, 2012), however, this Court rejected a defense argument that the Government is required to demonstrate that traditional investigative techniques are inadequate as to each and every investigative goal and as to each and every target subject.  There, as here, the defendant "cite[d] no law suggesting . . . that the Government is required – in connection with the necessity requirement – to make an individualized presentation as to each target subject and the efficacy of each potential investigative tool as to that target."  Kazarian, 2012 WL 1810214 at *11.

As discussed above, the November 10, 2016 and December 8, 2016 wiretap applications – like the October 2016 wiretap application – adequately explain why traditional investigative techniques were not adequate to uncover critical information about the scheme. (See Nov. 10, 2016 Cecchini Aff. ¶¶ 27-68 (explaining why video surveillance, physical surveillance, GPS devices, analysis of telephone records, confidential informants and undercover

officers, arrests, Grand Jury presentation, and search warrants were insufficient to achieve the goals of the investigation); Dec. 8, 2016 Cecchini Aff. ¶¶ 32-78 (same))

The Court concludes that the November 2016 and December 2016 wiretap applications satisfy the necessity requirement.

### 3. Subsequent Wiretap Applications

Blue contends that the Government acted improperly in obtaining wiretap authorizations during the period between December 2016 and March 2017, because "[a]t no point during the ten months of interception did [the investigators] ever go down and attempt traditional investigative techniques; instead, they kept informing the magistrate that they had yet to reach the unreachable star of perfect information . . . ." (Blue Br. (Dkt. No. 321) at 12) As discussed above, however, law enforcement's obligation is to explain what use it has made of traditional investigative techniques, and why the traditional investigative techniques have proven inadequate to accomplish all the goals of the investigation. The December 2016 – March 2017 wiretap applications meet this standard.

For example, in his March 2, 2017 affidavit, ADA Cecchini explains that investigators had obtained GPS devices for vehicles, but they could not identify the vehicles that Coles or Rose regularly used, because they switched their cars in November 2016. (See Mar. 2, 2017 Cecchini Aff. ¶¶ 56-57 ("A GPS was installed on the Coles' Range Rover . . . on October 21, 2016, and then renewed again on November 18, 2016. Since that renewal date, Coles is no longer using the Coles Range Rover and has apparently traded it in for another vehicle. We have observed Coles using different vehicles . . . . Once we determine the type of vehicle Coles will be driving . . . , we may seek a new authorization to install a GPS device on that vehicle . . . ."); ¶ 58 ("On October 21, 2016, an Order authorizing the installation and use of a GPS on a Cadillac

Escalade utilized by Rose was authorized; however, we have not observed Rose use the Escalade since the Order was signed, so a GPS device was not installed on that vehicle. Once we determine whether Rose is using one particular vehicle . . . we will consider seeking a search warrant . . . to install a GPS device[.]"))

Similarly, in his December 8, 2016 affidavit, ADA Cecchini discloses that investigators had obtained a confidential informant in October 2016, but that the informant had recently been fired from the 2 Wilson Place medical clinic. (See Dec. 8, 2016 Cecchini Aff. ¶¶ 59-60 ("[The confidential informant] provided some information on how the 2 Wilson Place clinic operated[,] [but] [t]his Friday, . . . [the confidential informant] informed [an investigator] that Coles terminated his services that day. . . . [S]ince he has been fired from the 2 Wilson Place clinic, the information that he can provide . . . [and] his usefulness from a proactive standpoint, is likely limited."); see also Feb. 3, 2017 Cecchini Aff. ¶¶ 69-70 ("[A]t this stage, [the confidential informant] no longer has any contact with Coles and . . . any future contact does not appear realistic either. . . . [The confidential informant] has not indicated any knowledge regarding Anthony Rose Jr. or his New York/New Jersey operations . . . .")

ADA Cecchini also addresses analysis of telephone records in his March 2, 2017 affidavit. Cecchini explains that investigators had subpoenaed telephone records, but that these records did not disclose the identities of the conspirators, because the conspirators had used prepaid accounts to obtain the phones. (See Mar. 2, 2017 Cecchini Aff. ¶ 67 ("[A] significant portion of the telephones that have been used to contact the Rose, Coles, Bill, George, and Sholomov telephones appear to be assigned to pre-paid accounts, thereby preventing us from knowing the user of those telephones."))

In sum, the investigators provided a "reasoned explanation" as to why "normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed or to be too dangerous[,]" which "is all that is required." <u>Scala</u>, 388 F. Supp. 2d at 403-04 (internal quotation marks and citations omitted). Accordingly, Defendant Blue's motion to suppress the wiretap evidence will be denied.

## II.    <u>SEVERANCE MOTION</u>

Blue contends that he is entitled to a severance for the following reasons:

1. he would suffer substantial prejudice in a joint trial, because he was involved "in only a tiny portion of the alleged conduct";

2. it is "possible – and perhaps likely – that Mr. Blue and Rose would raise antagonistic trial defenses, creating a situation in which a jury would have to convict one defendant to acquit another"; and

3. Blue is the only incarcerated defendant in this case, and the lengthy time other defendants will need to prepare for trial will "cause substantial delay and deprive him of his right to a speedy trial."

(Blue Br. (Dkt. No. 321) at 13, 17-22)

### A.    <u>Legal Standards</u>

Federal Rule of Criminal Procedure 14 provides that, even where joinder is proper under Rule 8(b), a court may grant a severance "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government . . . ." Fed. R. Crim. P. 14(a). In order to prevail on a severance motion under Rule 14, however, a "'defendant must show not simply some prejudice but <u>substantial</u> prejudice.'" <u>United States v. Sampson</u>, 385 F.3d 183, 190 (2d Cir. 2004) (quoting <u>United States v. Werner</u>, 620 F.2d 922, 928 (2d Cir. 1980)) (emphasis in <u>Sampson</u>). A defendant has the "extremely difficult burden" of showing that he would be so prejudiced by joinder that he would be denied a fair trial. <u>United States v. Casamento</u>, 887 F.2d 1141, 1149, 1154 (2d Cir. 1989) (internal quotation marks and citation omitted). It is not enough

for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[]."

Zafiro v. United States, 506 U.S. 534, 540 (1993).  Instead, "a district court should grant a

severance under Rule 14 only if there is a serious risk that a joint trial would compromise a

specific trial right of [a defendant], or prevent the jury from making a reliable judgment about

guilt or innocence."  Id. at 539.  Even in those rare instances where a defendant establishes a

"high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to

cure any risk of prejudice."  Id. (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)).

> The high standard set for obtaining a severance reflects the "preference in the

federal system for joint trials of defendants who are indicted together."  Zafiro, 506 U.S. at 537.

As the Second Circuit has explained,

> [t]he deference given by an appellate court to a trial court's severance decision
> reflects the policy favoring joinder of trials, especially when the underlying crime
> involves a common plan or scheme and defendants have been jointly indicted.
> Acknowledged in this policy is the inevitable tolerance of some slight prejudice to
> codefendants, which is deemed outweighed by the judicial economies resulting
> from the avoidance of duplicative trials.  Further, the risk of inconsistent verdicts
> resulting from separate trials, and the favorable position that later tried defendants
> obtain from familiarity with the prosecution's strategy is obviated through
> multidefendant trials.

United States v. Cardascia, 951 F.2d 474, 482-83 (2d Cir. 1991) (citing Richardson, 481 U.S. at

209-10).

> Severance motions are "committed to the sound discretion of the trial judge."

Casamento, 887 F.2d at 1149.  The Second Circuit has stated, however, that "the principles that

guide the district court's consideration of a motion for severance usually counsel denial."  United

States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993).

B.      **Analysis**

1.      **Lesser Role in the Charged Conspiracy**

Blue argues that he was involved "in only a tiny portion of the alleged conduct," noting that (1) he was in communication with only two of the defendants – Anthony Rose and Tonja Lewis; (2) he is alleged to have obtained information from only one source, which he then passed on to Rose; (3) he was involved in the five-year conspiracy for only six months; and (4) he is charged in only three counts of the thirty-two count Indictment.  (Blue Br. (Dkt. No. 321) at 15, 17-18)  Given these circumstances, Blue contends that he will suffer spillover prejudice at a joint trial with Anthony Rose and the other defendants.  Blue's arguments are not persuasive.

"'Differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.'"  United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003) (quoting United States v. Carson, 702 F.2d 351, 366-67 (2d Cir. 1983)).  "Even 'joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible.'"  Id. (quoting United States v. Locascio, 6 F.3d 924, 947 (2d Cir. 1993)).  Indeed, "the fact that one defendant played a comparatively lesser role in the overarching alleged scheme does not require severance.  That is especially so when jury instructions can avoid potential prejudice by instructing jurors that the Government must prove distinct acts involving each Defendant."  United States v. Lewis, No. 16-CR-786 (NSR), 2018 WL 6241445, at *3 (S.D.N.Y. Nov. 29, 2018); see also United States v. Eldridge, No. 09-CR-329, 2014 WL 7365929, at *5 (W.D.N.Y. Dec. 24, 2014) ("The Court recognizes that all joint trials which include charges against one defendant but not another are in some way prejudicial.  However, in light of the strong preference for joint trials, and the Court's ability to issue limiting instructions, this concept alone is not sufficient to require severance.").

Moreover, although the Government does not contend that Blue's role in the conspiracy is comparable to that of Rose, it appears that there will be substantial proof concerning his role in the alleged conspiracy. The Government proffers that the evidence at trial will show that "between October 2016 and April 2017, Rose and Blue texted, called, or attempted to call each other over 900 times." According to the Government, Blue led the expansion of the fraudulent scheme into New Jersey, and "helped Rose conceal the existence of the call center by acquiring 'burner' phones for Rose and his associates every few months." (Govt. Opp. (Dkt. No. 333) at 39-40)

The Government further asserts that at a separate trial of Blue, it would "seek to introduce much of the key evidence against Rose, because Blue's role in the scheme is intertwined with that of Rose." (Id. at 42) See Spinelli, 352 F.3d at 55-56 (affirming denial of severance motion where "much of the evidence about [co-defendant's] crimes would have been admissible at a separate trial of [defendant], since it was relevant to proving the nature and scope of the conspiracy in which both were, to differing degrees, involved"); Rosa, 11 F.3d at 341 ("[T]he fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately. . . . Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial[.]" (citing United States v. Villegas, 899 F.2d 1324, 1347-48 (2d Cir. 1990); United States v. Bari, 750 F.2d 1169, 1178 (2d Cir. 1984))).

To the extent that the evidence at a joint trial presents any risk of unfair prejudice to Blue, that issue will be addressed in an appropriate jury instruction. See United States v.

Miller, 116 F.3d 641, 679 (2d Cir. 1997) (district court did not err in denying severance motions where it "gave limiting instructions in order to deter any potential spillover").

In sum, Blue's allegedly lesser role in the charged conspiracy does not justify a severance.

### 2. Possible Antagonistic Defenses

Blue contends that he is entitled to a severance because he and Rose may advance antagonistic defenses at trial. (Blue Br. (Dkt. No. 321) at 13, 19) Blue might argue at trial that he was not aware of the existence and scope of the alleged fraud because Rose "actively prevented [Blue] from learning the truth about his business practices." (Id. at 19) Blue further speculates that Rose might "argue that there was no larger conspiracy and that he did not have sufficient knowledge of how Mr. Blue (and others) obtained information through allegedly improper methods." (Id.)

"Defenses are mutually antagonistic when accepting one defense requires that 'the jury must of necessity convict a second defendant.'" United States v. Yousef, 327 F.3d 56, 151 (2d Cir. 2003) (quoting Cardascia, 951 F.2d at, 484; citing Zafiro, 506 U.S. at 542 (Stevens, J., concurring)). "Mere 'fingerpointing'" among co-defendants "does not require severance," however. Casamento, 887 F.2d at 1154. And even "'mutually antagonistic defenses are not prejudicial per se.'" United States v. Haynes, 16 F.3d 29, 32 (2d Cir. 1994) (quoting Zafiro, 506 U.S. at 538). Instead, a defendant must show that antagonistic defenses will result in prejudice such that "there is a serious risk that a joint trial would compromise a specific trial right." Zafiro, 506 U.S. at 539. Finally, "'Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.'" Yousef, 327 F.3d at 151 (quoting Zafiro, 506 U.S. at 538–39).

Here, Blue's suggestion that he might claim that he was duped by Rose, and his speculation that Rose might seek to cast blame on Blue, does not justify a severance. As discussed above, "[m]ere 'fingerpointing'" among co-defendants "does not require severance." Casamento, 887 F.2d at 1154. Indeed, courts routinely deny severance motions premised on such "fingerpointing" arguments.

In Zafiro, for example, defendants argued that a severance must be granted where "two defendants both claim they are innocent and each accuses the other of the crime[.]" In such circumstances, defendants argued, "a jury will conclude (1) that both defendants are lying and convict them both on that basis, or (2) that at least one of the two must be guilty without regard to whether the Government has proved its case beyond a reasonable doubt." Zafiro, 506 U.S. at 540. In ruling that a severance was not warranted, the Supreme Court stated that, "even if there were some risk of prejudice, here it is of the type that can be cured with proper instructions." Id.; see also Cardascia, 951 F.2d at 485-86 (defendant's claim that he was "duped by the codefendants" "plainly is typical of co-conspirator trials and does not warrant severance"); United States v. Lewis, No. 16-CR-786 (NSR), 2018 WL 6241445, at *2-4 (S.D.N.Y. Nov. 29, 2018) (denying severance motion where defendant A claimed "that he was duped by" defendants B and C, while defendant B "state[d] that he was used and victimized by" defendant A, because "[n]umerous [c]ourts have rejected what has been called in common parlance 'the finger-pointing argument'"); United States v. Sezanayev, No. 17 CR. 262 (LGS), 2018 WL 2324077, at *2 (S.D.N.Y. May 22, 2018) ("In conspiracy trials, movants commonly 'seek severance essentially on the ground that they will argue that they are not guilty because they were duped by other members of the conspiracy.' 'Finger pointing' is not a basis for severance.") (quoting

United States v. Hameedi, No. 17 Cr. 137 (JGK), 2017 WL 5152991, at *4 (S.D.N.Y. Nov. 3, 2017)).

To the extent that Blue seeks a severance on grounds of mutually antagonistic defenses, his motion will be denied.

### 3. Blue's Pretrial Detention

Blue contends that he is entitled to a severance, because he is the only defendant in this case who is being held in pretrial detention. Blue further contends that his co-defendants will need much longer to prepare for trial, and that their preparation for trial will "cause substantial delay [in his case] and deprive him of his right to a speedy trial." (Blue Br. (Dkt. No. 321) at 13, 21-22)

"[T]he Supreme Court has instructed that severance motions should be granted 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.' . . . If [a] defendant . . . claims that the length of his pretrial detention violates his right to due process, his remedy would be an application for pretrial release, not a severance motion." United States v. Vega, 309 F. Supp. 2d 609, 615 n.5 (S.D.N.Y. 2004) (quoting Zafiro, 506 U.S. at 539; citing United States v. Millan, 4 F.3d 1038, 1043 (2d Cir. 1993)). Moreover, "the fact that Defendant will be incarcerated while he is awaiting trial 'is not enough to overcome the strong interests in fairness, judicial economy and judicial efficiency, which would be best served by [a combined trial] of defendants who were indicted together and whose charges all arise out of the same set of operative facts.'" United States v. Jones, 143 F. Supp. 3d 78, 92 (W.D.N.Y. 2015) (quoting United States v. Lockwood, No. 11-CR-085, 2012 WL 6204194, at *3 (W.D.N.Y. Dec. 12, 2012)) (alteration in Jones).

Here, the Indictment alleges thirty-two counts against twenty-seven defendants. The Government contends that the Defendants participated in a complex conspiracy that continued for at least five years. Discovery has been voluminous. Given these circumstances, Blue's complaints regarding delay associated with co-defendants are not persuasive.

Blue's argument that his pretrial detention has caused him "substantial prejudice" is likewise unpersuasive. Blue was writted into federal custody on January 8, 2020 from a New Jersey correctional institution, where he had recently begun serving a ten-year sentence on a New Jersey narcotics offense. (<u>See</u> Govt. Opp. (Dkt. No. 333) at 49; Bail Disposition (Dkt. No. 172)) Accordingly, even if this Court were to vacate the detention order as to Blue, he would remain in custody.

*    *    *    *

Blue's motion for a severance will be denied.

## II.    <u>MOTION FOR A BILL OF PARTICULARS</u>

Blue seeks a bill of particulars specifying the following: "(a) the date and content of each instance where Mr. Blue allegedly received confidential patient information from Tonja Lewis or other hospital personnel; (b) the date and content of each instance that Mr. Blue allegedly provided individually identifiable health information to Rose; (c) the date and amount of any alleged payments Mr. Blue received from Rose in exchange for the information; (d) the date and amount of any alleged payments by Mr. Blue in exchange for the information; (e) the content of any statements showing that Mr. Blue knew that Rose would provide the individually identifiable health information to others; and (f) any statements or other evidence purporting to establish that Mr. Blue knew that the alleged activity was wrong or illegal." (Blue Br. (Dkt. No. 321) at 23)

A. **Legal Standards**

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars where necessary to ""'"prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.""'" United States v. D'Amico, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (quoting United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988) (quoting United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam))). The decision to grant or deny a bill of particulars "rests within the sound discretion of the district court." Bortnovsky, 820 F.2d at 574.

"A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." United States v. Gibson, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001) (citing United States v. Strawberry, 892 F. Supp. 519, 526 (S.D.N.Y. 1995)). "Instead, its purpose is to supplement the facts contained in the indictment when necessary to enable defendants to identify with sufficient particularity the nature of the charges against them." United States v. Gotti, No. S4 02 CR 743(RCC), 2004 WL 32858, at *8 (S.D.N.Y. Jan. 6, 2004) (citing Bortnovsky, 820 F.2d at 574); accord United States v. Mandell, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010) ("The standard for determining whether a bill of particulars is appropriate is based on necessity . . . .").

"Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." Bortnovsky, 820 F.2d at 574 (citations omitted); see also United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999) ("[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." (citing United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) abrogated on other grounds by United States v. Marcus, 628 F.3d 36, 41 (2d Cir.

2010))).  However, "[t]he Government d[oes] not fulfill its obligation merely by providing mountains of documents to defense counsel[,] who [a]re left unguided as to which documents [the Government will use at trial]."  <u>Bortnovsky</u>, 820 F.2d at 575.

"[T]he proper inquiry is not whether the requested information would be helpful to the defense, but rather whether the information is <u>necessary</u> to the defense."  <u>United States v. Dupree</u>, No. 10-CR-627 (KAM), 2011 WL 5976006, at *6 (E.D.N.Y. Nov. 29, 2011) (emphasis in original) (citing <u>Torres</u>, 901 F.2d at 234; <u>United States v. Feola</u>, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), <u>aff'd</u>, 875 F.2d 857 (2d Cir. 1989)).  "It is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts."  <u>Feola</u>, 651 F. Supp. at 1132.  More broadly, the Government is not required to "set out with precision every act committed by . . . conspirators in furtherance of the conspiracy[.]"  <u>United States v. Cohen</u>, 518 F.2d 727, 733 (2d Cir. 1975) (citations omitted).  "'[W]heres, whens, and with whoms'" of the conspiracy are "'beyond the scope of a bill of particulars.'"  <u>United States v. Barret</u>, 824 F. Supp. 2d 419, 439 (E.D.N.Y. 2011) (quoting <u>United States v. Mitlof</u>, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001)).

Finally, "the [G]overnment need not provide particulars where it has none."  <u>United States v. Rajaratnam</u>, No. 09 Cr. 1184(RJH), 2010 WL 2788168, at *9 (S.D.N.Y. July 13, 2010).

**B.**  **<u>Analysis</u>**

Here, the Government has provided sufficient information about the nature of the charges against Blue to allow him to prepare his defense.  As an initial matter, Blue is charged in a speaking indictment that describes the alleged criminal conduct in detail, over fifty-three pages.  (Indictment (Dkt. No. 1))  Blue is named in Counts One, Four, and Seventeen.  (<u>Id.</u>)  As to each

of the three counts in which Blue is named, the Indictment provides specific factual information about the nature of the charge and the date range in which the alleged criminal conduct took place.

In Count One – the Travel Act conspiracy charge – Blue is identified as one of the "Payor Conspirators" who was "responsible for generating lead sources, obtaining the names and contact information of accident victims from lead sources, and paying money to the lead sources in exchange for such information."  (Id. ¶ 4(c))  The "means and methods" of the alleged conspiracy are described in detail over five pages.  (Id. ¶¶ 8-14)  Blue's co-conspirators are identified by name in Count One, and Count One lists numerous overt acts committed by Blue and his co-defendants in furtherance of the conspiracy during the period between 2014 and November 2019.  (Id. ¶¶ 4, 17)

Similarly, in Count Four, the Government alleges that between 2016 and 2017, "BLUE made payments to hospital personnel in exchange for individually identifiable health information concerning automobile accident victims, which information BLUE transmitted to ANTHONY ROSE, in exchange for payment."  (Id. ¶ 23) (emphasis in original)

And in Count Seventeen, the Government alleges that between October 2016 and March 2017, Blue corruptly gave a thing of value to an employee of a hospital that received more than $10,000 from a Federal program, "to wit, BLUE paid TONJA LEWIS, a/k/a 'J1,' to improperly disclose confidential patient information concerning motor vehicle accident victims, valued in excess of $5,000, obtained during the discharge of LEWIS's professional responsibilities at Hospital-7, which receives in excess of $10,000 in federal funds."  (Id. ¶ 49) (emphasis in original)

Moreover, Blue has received voluminous discovery from the Government, including the affidavits submitted in connection with all ten wiretap applications, as well as tens of thousands of recorded telephone conversations and text messages with text-searchable line sheets containing summaries of all pertinent texts and calls. The wiretap applications alone contain "over 1300 pages and 2700 paragraphs of affidavits submitted in support of the wiretaps." (Govt. Opp. (Dkt. No. 333) at 3) These materials explain the Government's investigation in detail.

The line sheets summarizing the relevant text messages and telephone calls "allow counsel to search [for pertinent conversations] by Blue's name, his known nicknames . . . , or by his known cell phone numbers," and "to listen to [an] intercepted call with a single mouse click." (Id. at 56) As the Government points out, using these materials, Blue's counsel can readily discover the information he seeks in a bill of particulars. (Id.; see also id. at 54-55 (listing examples of calls and text messages containing information Blue seeks in a bill of particulars, including that Blue was "clearly aware of HIPAA," that "Blue and Rose discussed covering their tracks regarding their use of phones with lead sources," and that "Blue and Rose discussed how to transfer money generated by the scheme"))

Several of the cases Blue cites in support of his motion for a bill of particulars present the "'needle in a haystack' problem," in which defendants must "sift[] through thousands of legitimate transactions in an attempt to discover which transactions the government s[eeks] to prove [are] fraudulent." United States v. Kahale, 789 F. Supp. 2d 359, 376 (E.D.N.Y. 2009). In Bortnovsky, for example – where the Government provided the defense with four thousand documents, but contended that only three documents were fraudulent – the court found that it was error to deny a bill of particulars identifying the fraudulent documents. See Bortnovsky, 820

F.2d at 574-75.  And in <u>United States v. Nachamie</u>, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) – where

the Government produced discovery concerning two thousand Medicare claims – the court

required the Government to provide a bill of particulars identifying which claims it contended

were false and fraudulent, and how they were false and fraudulent.  <u>See</u> <u>Nachamie</u>, 91 F. Supp.

2d at 571-73.

   Here, in contrast to the circumstances in <u>Bortnovsky</u> and <u>Nachamie</u>, the

Government contends that all of the actions of the alleged conspirators were fraudulent; no

aspect of the no-fault insurance scheme was legitimate.  Accordingly, Blue need not sift through

the discovery materials to determine what is alleged to be fraudulent.  <u>See</u> <u>United States v.</u>

<u>Drivas</u>, No. 10-CR-771 NG, 2012 WL 3011023, at *4 (E.D.N.Y. July 19, 2012) (denying request

for bill of particulars "identifying specific documents and transactions the Government

contend[ed] [we]re fraudulent" where government represented "that 'all the transactions billed to

Medicare by [clinic were] fraudulent, as [that] clinic existed primarily to commit fraud'")

(citations omitted); <u>Dupree</u>, 2011 WL 5976006, at *8 (denying request for bill of particulars

where the government alleged that "defendants committed a 'large, multi-year fraud that

permeated and sustained their entire business'") (citation omitted); <u>United States v. Shteyman</u>

No. 10 CR 347 SJ, 2011 WL 2006291, at *1 (E.D.N.Y. May 23, 2011) (denying request for bill

of particulars identifying allegedly false Medicare claims not identified in indictment where the

Government "argu[ed] that every last penny collected or billed by [the defendants' clinic] [we]re

criminal proceeds'") (citation omitted).[2]

---

[2]  The remaining cases cited by Blue are distinguishable in that – in those cases – the defendants
lacked basic information about the allegations against them.  For example, in <u>United States v.</u>
<u>Davidoff</u>, 845 F.2d 1151 (2d Cir. 1988), the Second Circuit found that the district court erred in
denying a bill of particulars, where the Government argued at trial that defendants extorted

Finally, Blue complains that the line sheets do not "identify <u>other</u> calls that Mr. Blue is not on but which the government may seek to offer at his trial." (Def. Reply (Dkt. No. 340) at 14) (emphasis in original) The Government is not required to identify the "'wheres, whens, and with whoms'" of a conspiracy, <u>Barret</u>, 824 F. Supp. 2d at 439, nor is it required to

_____

companies not named in the indictment, and as to which the Government had not asserted any allegations prior to trial. <u>Davidoff</u>, 845 F.2d at 1154. Similarly, in <u>Rajaratnam</u>, an insider trading case, the district court granted a bill of particulars where the indictment provided little to no detail beyond the name of the securities at issue. <u>See</u> <u>Rajaratnam</u>, 2010 WL 2788168 at *4-9. In <u>United States v. Lino</u>, No. 00 CR. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001), certain defendants sought bills of particulars in a twenty-three defendant, organized crime RICO case involving "four conspiracies to commit securities fraud, wire fraud and commercial bribery, nine substantive securities fraud offenses, two money laundering conspiracies, a union pension fund fraud and illegal kickback conspiracy, and one count of witness tampering." 2001 WL 8356, at *1. The <u>Lino</u> court granted in part certain of the defendants' requests for bills of particulars – noting that "[h]eightened scrutiny must be applied to . . . RICO allegations" – where the defendants lacked information concerning the identity of the union officials they allegedly bribed, the pension funds the union officials served, and the amounts of the bribes the union officials were paid. <u>See</u> <u>id.</u> at *3-11. And in <u>United States v. Savin</u>, No. 00 CR. 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001), the district court granted a bill of particulars in part where the defendant, an investment advisor, was alleged to have "pilfered his client's money through an unspecified series of 'intercompany transfers,'" but the Government had not identified "the amounts, dates, means, corporate entities, or co-conspirators involved." <u>Savin</u>, 2001 WL 243533, at *3. <u>See</u> <u>also</u> <u>United States v. Murgio</u>, 209 F. Supp. 3d 698, 723-24 (S.D.N.Y. 2016) (granting bill of particulars as to "dates, locations, and amounts of any bribes that [defendant] paid to" co-defendant directly, where Government briefing suggested that no such payments were made, because the defendant was "entitled to know" if "that characterization [was] inaccurate"); <u>United States v. Bin Laden</u>, 92 F. Supp. 2d 225, 236 (S.D.N.Y. 2000) (granting bill of particulars as to charged overt acts where the alleged conspiracies covered such a broad range of conduct, time, and place that they "impose[d] a seemingly unprecedented and unique burden on the Defendants . . . in trying to answer the charges[,]" and where certain alleged overt acts were "described only in terms as general as engaging in 'travel' and conducting 'business'"); <u>United States v. Alegria</u>, No. 90 CR. 0450(RWS), 1991 WL 33284, at *2-4 (S.D.N.Y. Mar. 7, 1991) (conspiracy to alter vehicle identification numbers ("VINs"); bill of particulars granted as to the "dates, times, and places of the alleged overt acts" as well as the "VIN number[s] of . . . additional cars" not identified in indictment; indictment included "no information about the defendants' relationship with each other, and the discovery materials . . . provide[d] little elucidation of contacts among the defendants"; given that defendants were charged with crimes involving property, they were "entitled . . . to an exact description of the property").

identify the evidence it intends to offer at trial.  See Savin, 2001 WL 243533, at *6 (citing

Nachamie, 91 F. Supp. 2d at 568-59).

Blue's motion for a bill of particulars will be denied.

**CONCLUSION**

For the reasons stated above, Defendant Blue's motions to suppress, for a

severance, and for a bill of particulars are denied in their entirety.  The Clerk of Court is directed

to terminate the motion (Dkt. No. 320).

Dated: New York, New York
May 24, 2021

SO ORDERED.

Paul G. Gardephe
United States District Judge